## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

**DAVID BARNES**                                                                                              **Plaintiff**

**v.**                                                                                                        **No. 3:18-cv-00507-BJB**

**LANTECH.COM, LLC**                                                                                          **Defendant**

### Opinion Granting Summary Judgment

David Barnes claims that Lantech.com, a shipping-supplies manufacturer, changed his hours, docked his pay, and ultimately fired him in retaliation for taking leave under the Family Medical Leave Act. But Lantech blames Barnes's fate—set in motion months before Barnes's leave—on his record of falling asleep on the job. It was Lantech, after all, that suggested Barnes exercise his FMLA rights in the first place. Indeed, the record contains nothing more than speculation that Barnes's leave *caused* him to suffer any adverse employment actions, or that Lantech's explanation is pretextual. Because this evidence would not allow a reasonable fact-finder to conclude that Lantech discriminated against Barnes for taking FMLA leave, the Court **GRANTS** Lantech's motion for summary judgment. DN 24.

**I.     Barnes's warnings, leave, and termination.**

The parties largely agree on the actions that preceded Barnes's termination. The question at issue is why they happened: did Lantech fire Barnes in retaliation for Barnes taking FMLA leave?

Barnes worked at Lantech from May 1992 until March 2018. Summary Judgment Response [DN 25] at 3. In 2017 and 2018, Barnes worked as a Configurator—a desk job involving "light engineering work." Barnes Deposition [DN 24-1] at 70:17–24. Until early 2017, Barnes served as a Configuration Team Leader. Norris Affidavit [DN 24-3], Ex. A at 8.

That supervisory role ended, and this saga began, in January 2017. After multiple Lantech employees reported Barnes sleeping at work, the company gave Barnes a written "Final Warning" for performance issues that (along with other admonishments) removed Barnes from his supervisory role. *Id.* at 7–8. Lantech explained that Barnes's compensation (which included an additional $1/hour for supervisory duties) would not be affected at that time. But failure to improve would "result in additional disciplinary action, up to and including Lantech termination." *Id.* at 8.

Seven months later, in August 2017, co-workers again reported Barnes sleeping on the job. Norris Affidavit ¶ 12.[1] Lantech gave Barnes a written "Final Notice" and reduced Barnes's hourly pay by $1 to reflect the previous removal of his supervisory duties. *Id.* ¶¶ 14–15. The Final Notice stated that if Barnes were again found asleep on the job, he would immediately lose his job. *Id.*, Ex. B at 10. At a meeting that same day, Barnes—a diabetic—explained that he took medication that caused drowsiness. Barnes Declaration [DN 25-1] ¶ 7. Lantech responded that if a medical issue caused him to sleep on the job, Barnes could request FMLA leave. Norris Affidavit, Ex. B at 10; Barnes Declaration ¶ 7. Barnes did indeed request and receive FMLA leave that August. Barnes Declaration ¶¶ 8–10. Although the FMLA did not require Lantech to pay Barnes while he was on leave (the Act only guaranteed he could resume his position), Lantech paid him during his one-month absence. Barnes Deposition 67:3–5.

Barnes returned to work in September 2017 without medical restrictions and with a new medication that Barnes claimed resolved the drowsiness issue. Barnes Dep. 65:7–24; Unemployment Ins. Tr. [DN 24-7], at 1138–39, 1164–65, 1193–96. His new shift differed by an hour—5:00 a.m. until 3:30 p.m. instead of 6:00 a.m. until 4:30 p.m., which he worked before the FMLA leave. *See* Response, Exs. C, D [DNs 25-3, 25-4].

---

[1] Becky Norris is Lantech's Human Resource Generalist. Norris Affidavit ¶ 2.

In March 2018, two Lantech employees separately reported seeing Barnes asleep on the job, each on a different occasion. Norris Affidavit, Ex. D at 14, Ex. E at 16, Ex. F at 18. Based on the statements Lantech collected from those two employees and Barnes's two prior warnings, Lantech decided to terminate Barnes. Norris Affidavit ¶¶ 18–19. Barnes first pursued unemployment benefits; he challenged a state administrator's determination that Lantech discharged him for cause for sleeping on the job, but lost that appeal in state court. Jefferson Cir. Ct. Op. and Order [DN 24-8] at 3, 6. Then Barnes sued Lantech on several employment-law and FMLA claims, though the only claim that remains in this lawsuit is his FMLA retaliation claim under 29 U.S.C. § 2615(a)(2). *See generally* Complaint [DN 9]; Agreed Partial Dismissal Judgment [DN 11]; Stipulation of Dismissal [DN 22].

## II.     This Court's role in reviewing Lantech's summary-judgment motion.

Before a court may grant a motion for summary judgment, it must find that no genuine dispute concerns any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the nonmoving party thereafter must produce specific facts demonstrating a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether a genuine factual dispute exists, a court should not "weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury." *Arban v. W. Pub. Corp.*, 345 F.3d 390, 400 (6th Cir. 2003). Instead, a court must view "the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016).

### III. Barnes's rights under the FMLA and obligations on summary judgment.

In enacting the FMLA, Congress gave eligible employees the right to take unpaid, job-protected leave for, among other reasons, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The parties don't dispute that Barnes's diabetes amounts to a serious health condition under the statute, or that Barnes was entitled to FMLA leave, or that Lantech knew about his condition or leave. Indeed, no one disputes that it was *Lantech's* idea for Barnes take leave; the parties discussed it during their August 2017 meeting concerning Barnes's (second of two) "Final Warning[s]." Barnes received the leave he was due under the Act, and even got paid for it. Though his motion spends ample time arguing that Lantech "interfered" with his exercise of FMLA rights, Barnes has no remaining claim on that point; the Court dismissed his FMLA interference cause of action, with prejudice, in an *agreed* order on September 25, 2018. Agreed Partial Dismissal Judgment ¶ 3.

The Act also requires "restoration to position … on return from such leave." 29 U.S.C. § 2614(a). Anyone who properly takes and returns from leave "shall be entitled":

"(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or

"(B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id.*

No one doubts that Barnes resumed his prior position as a Configurator after he returned from leave in September; Barnes, however, argues that his change in shift and decrease in pay means Lantech did not fully restore his pre-leave position. His claim is that Lantech "discharge[d] or in any other manner discriminate[d] against [him] for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a)(2). Courts and the Labor Department have interpreted § 2615(a)(2) to prevent employers from using "FMLA leave as a negative factor in" terminating an employee. *See Arban*, 345 F.3d at 403 (quoting 29 C.F.R. § 825.220(c)).

4

Because Barnes relies on indirect evidence to prove his FMLA retaliation claim, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) for employment-discrimination cases applies here:

1. Barnes must present evidence to establish a prima facie case of FMLA retaliation. *Marshall v. Rawlings Co.*, 854 F.3d 368, 379 (6th Cir. 2017). This requires showing that:

    a. Barnes engaged in activity protected by the FMLA;

    b. Lantech knew Barnes exercised his protected rights;

    c. Barnes suffered an adverse employment action; and

    d. Barnes would not have suffered an adverse action had he not taken FMLA leave. *Id.*.

   "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)).

2. If Barnes meets this requirement by pointing to evidence in the summary-judgment record, the burden shifts to Lantech to show a legitimate, nondiscriminatory reason for its action—again, by pointing to record evidence. *Marshall*, 854 F.3d at 379 (citing *McDonnell Douglas*, 411 U.S. at 802).

3. If Lantech carries that burden, Barnes must identify evidence indicating that the purportedly legitimate and nondiscriminatory reason Lantech offered was in fact a pretext masking discriminatory retaliation for his exercise of FMLA rights. *Id.*

**IV.    The record does not support Barnes's claim that Lantech's reaction to his performance issues was really retaliation for his use of FMLA leave.**

Barnes identifies three potential adverse actions that, he contends, give rise to FMLA retaliation liability: his change in work hours, his reduced pay, and his firing. Response at 11. None, however, find more than de minimis support in the record. Those facts do not suggest that Barnes's exercise of his FMLA rights caused Lantech to take these actions, or (with respect to the change in shift) that the change even amounted to an adverse action. Nor has Barnes identified any facts supporting his contention that Lantech's explanation (sleeping on the job) is pretextual.

5

The first two elements of Barnes's prima facie case are clear for all three alleged adverse actions: He engaged in a protected activity by taking his FMLA leave, and Lantech knew that Barnes exercised his rights when the company accepted his request. Barnes Declaration ¶¶ 8–10. The real questions are whether a jury could find that the three actions were in fact adverse, whether the FMLA leave helped caused the adverse actions, and whether Lantech's justification is pretextual.

**Change in work schedule.** Barnes preferred his early start time of 5:00 a.m. because it allowed him to beat the traffic from his home in Shelbyville on the way to work in Louisville. *Id.* ¶ 4. For reasons unknown to the Court, Lantech delayed his start time to 6:00 a.m. upon Barnes's return from FMLA, though it did not reduce his overall hours. *Id.* ¶¶ 12–13. On the record before the Court, this change in Barnes's work hours does not amount to an adverse action that allows him to sue.

An adverse employment action is "a materially adverse change in the terms of employment." *White v. Burlington N. & Santa Fe R.R. Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (en banc), *aff'd*, 548 U.S. 53 (2006). In the retaliation context, this "consists of any action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (internal citation omitted). Courts have recognized several actions the law considers "a significant change in employment status": "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *White*, 364 F.3d at 798.

A "mere inconvenience," by contrast, is insufficient to establish an adverse employment action. *White*, 364 F.3d at 797 (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)). Barnes's work schedule did not alter the number of hours he worked. His only objection is the inconvenience of this later time relative to his preferred earlier start. *See* Response at 11. He cites no precedent treating such a time-shift as an adverse action. *Id.* at 12. (Not to mention any evidence, aside from his own speculation, indicating that his FMLA leave caused the change—an additional

6

reason this claim fails on summary judgment.). This schedule change does not amount to an adverse action. Courts within the Sixth Circuit have reached the same conclusion even with respect to much more substantial changes in work hours. In *Reynolds v. Michigan Department of Corrections*, for example, the court concluded that an employee's "discontent with the change to Shift 2 only reflects a 'mere inconvenience' and not a 'significant change in [his] employment status'" giving rise to an adverse action under Title VII. No. 12-12561, 2014 WL 172287, at *4 (E.D. Mich. Jan. 15, 2014) (quoting *White*, 364 F.3d at 797–98).

**Decreased pay.** Barnes contends that Lantech's decision to reduce his hourly pay by $1 when it suggested he take FMLA leave amounts to retaliation for his decision to accept the suggestion.

He lacks factual support, however, for his contention that this pre-leave pay cut amounts to post-leave retaliation. "A materially adverse action must occur *after* an employee engages in a protected activity …." *Reitz v. Ford Motor Co.*, No. 3:16-cv-00765, 2019 WL 4675387, at *9 (W.D. Ky. Sept. 25, 2019). In another FMLA case where the termination "wheels were in motion" *before* the employee's leave and employer's decision to terminate, the Sixth Circuit recognized that the timeline undercut any inference that the leave caused the discipline. *See Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 451 (6th Cir. 2017) (FMLA retaliation plaintiff did not "create a genuine dispute as to whether his termination was causally related to his FMLA leave because 'the wheels were in motion for his termination before he left ….'") (alteration adopted) (quoting *Bush v. Compass Group USA*, 194 F. Supp. 3d 580, 589 (W.D. Ky. 2016)).

That is the case here. Lantech first removed Barnes from his supervisory duties in January 2017 after issuing the (first) "Final Warning." Norris Affidavit ¶¶ 14–15. At that point—seven months before Barnes's leave—nothing in the record indicates the parties had even discussed the FMLA. But Lantech *had* already warned Barnes that further performance issues could result in the pay cut (and termination) that eventually happened: "Your salary will not be impacted by this move

7

*at this time*[,]" but "failure to achieve and sustain these improvement benchmarks will result in additional disciplinary action, *up to and including Lantech termination*." *Id.*, Exhibit A at 8 (emphasis added). When Lantech did implement the pay cut in August, its (second) "Final Notice" traced that action to Barnes's prior (undisputed) reduction in his responsibilities and his continued inability to meet expectations. Norris Affidavit ¶¶ 14–15. Barnes offers no evidence—again, other than his suspicion about timing—that his decision to take the suggested leave contributed to his reduction in pay. *Cf. Skrjanc v. Great Lakes Power Serv. Co.,* 272 F.3d 309, 317 (6th Cir. 2001) ("[T]emporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual."). Barnes does not dispute that his job duties did in fact change when he lost his supervisory duties, or that this change in duties occurred well before the FMLA entered the picture. The record therefore affords no basis for denying Lantech's motion with respect to the pay cut.

**Termination.** Lantech accepts that Barnes's termination was an adverse employment action. *See* Summary Judgment Reply [DN 32] at 3. Again, however, Barnes has not carried his burden of showing a causal connection to the FMLA leave. And even assuming the record contained evidence sufficient to make out a prima facie case, it lacks any facts that suggest Lantech's nondiscriminatory explanation for the firing is pretext for retaliation.

Unlike the pay cut, the termination obviously came after Barnes's leave. But like the pay cut, termination was on the table well before his leave and his firing. And it did not occur until more than six months had passed since Barnes returned from leave. *See* Transcribed Doctor's Note [DN 24-6]; Norris Affidavit ¶ 21. That the termination discussion and implementation bracketed the leave—several months apart on either side—discounts any inference that the leave drove Lantech's actions. "[T]here cannot be a causal link between protected activity and an adverse action when the employer was already considering the adverse action prior to the protected activity." *Reitz*, 2019 WL 4675387,

8

at *12.  Instead, "[t]he protected activity must be the impetus for the materially adverse action." *Id.* In *Land v. Southern States*, the Sixth Circuit affirmed a determination that a Title VII plaintiff's hostile-work-environment protest did not cause his firing when his employer was already considering termination, based on documented performance concerns, several days before the protest. 740 F. App'x 845, 850 (6th Cir. 2018); *see also Bush*, 683 F. App'x at 453 ("[T]he record clearly rebuts any inference that [the plaintiff] was fired in retaliation for taking FMLA leave, because [his employer] had decided to let him go four days prior to learning that he would take such leave.").

Lantech also points to considerable evidence that it did, in fact, fire Barnes for sleeping on the job: a "Final Warning" letter in January 2017 indicating he was "asleep at [his] desk several times[,] even in the same day," a "Final Notice" in August 2017, continued reports of sleeping after the leave, and the contemporaneous explanation Barnes received at his eventual firing in March 2018.  Norris Affidavit ¶¶ 7, 12, 17–21.  The summary judgment papers also note, without any pushback from Barnes, that the company suggested the leave in the first place and continued to pay him of its own accord.  Summary Judgment Motion at 4; Response at 3.  These facts, as recounted by Barnes and Lantech, sound like a termination *despite* medical leave meant to address Barnes's drowsiness, not termination *because of* that leave.  The FMLA leave conceivably could have resolved the sleep issue by allowing Barnes time to resolve his medication, but the evidence of Barnes's continued sleep indicates the medical efforts apparently did not succeed.

Barnes offers little evidence in rebuttal—certainly none sufficient to sustain a jury verdict that Lantech retaliated.  The length of time that passed between Barnes's FMLA leave and termination seems to be his primary support for the notion that the two are causally connected.  To be sure, close proximity in time between protected activity and adverse action may sometimes give rise to an inference of causally connected retaliation.  *Seeger*, 681 F.3d at 283–84.  But when—as here—"some time elapses between when the employer learns of a protected activity and the subsequent adverse

9

employment action," the Sixth Circuit has recognized that timing alone is not enough: "the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Henderson v. Chrysler Group*, 610 F. App'x 488, 495 (6th Cir. 2015) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). The six months between Barnes's return and termination cannot by itself support a finding of retaliation, particularly when viewed along with the seven months between Lantech's first termination warning and Barnes's FMLA leave. *See* Barnes Declaration ¶¶ 8–10; Norris Affidavit ¶¶ 19–20; *Henderson*, 610 F. App'x at 495 (six to seven months between an FMLA retaliation plaintiff's protected activity and the adverse employment action was not "'very close' in time, and without more, cannot sustain an inference of a causal connection.").

Barnes's performance issues pre-dating his FMLA leave also undercut his argument that temporal proximity supports a causal connection. Lantech's January 2017 warning expressly threatened termination. When several employees reported that Barnes was sleeping at his desk again, Lantech gave Barnes another warning instead of terminating him. And Lantech's August 2017 notice stated that the next time Barnes was found asleep would "result in immediate termination." Norris Affidavit, Ex. B at 10. Lantech also explained that if medical reasons were creating the issue, he could request FMLA leave. *Id.*

Even if Barnes could establish a prima facie case, moreover, Lantech has articulated a legitimate, nondiscriminatory reason for terminating Barnes: his sleep on the job. "The Sixth Circuit, in multiple unpublished opinions, has made it clear that sleeping on the job is a legitimate, nondiscriminatory ground for terminating an employee's employment when an employer has a clearly established policy against sleeping." *James v. ABX Air, Inc.*, No. 1:03-cv-00480, 2006 WL 783465, at *5 (S.D. Ohio Mar. 23, 2006) (collecting cases); *Sergent v. Ashland Hosp. Corp.*, No. 13-cv-154, 2015 WL 5312966, at *7 (E.D. Ky. Sept. 10, 2015) (employer articulated a legitimate, nondiscriminatory reason for termination when two other co-workers observed the plaintiff sleeping

10

on duty). Sleeping on the job is a legitimate, nondiscriminatory reason that would justify termination—and Barnes does not resist that proposition.

To overcome it, Barnes must point to evidence that Lantech's reason "(1) had no basis in fact, (2) did not actually motivate the adverse employment action, or (3) was insufficient to warrant the adverse action." *Crawford*, 531 F. App'x at 629. Barnes focuses on whether Lantech's reason had any basis in fact. He claims that there is "conflicting evidence regarding whether Barnes was sleeping on the job." Response at 12. To show pretext under the "no basis in fact" prong, Barnes must identify proof that the reason given for his termination never happened or was factually false. *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502 (6th Cir. 2007). He must do more than show "a dispute over the facts upon which the discharge is based," because the "key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Seeger*, 681 F.3d at 285 (citations omitted). In other words, what matters is the fact that the employer acted based on a nondiscriminatory reason, not necessarily whether the employee might disagree with that nondiscriminatory reason. *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001) ("[E]ven if all of [the plaintiff's] assertions about his performance were true … [the plaintiff's] disagreement with [his employer's] honest business judgment regarding his work does not create sufficient evidence of pretext in the face of the substantial evidence that [the employer] had a reasonable basis to be dissatisfied."); *Seeger*, 681 F.3d at 285 ("employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless.") (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)).

Ample unrebutted evidence shows that Lantech acted—both before and after the leave—on the basis that Barnes was sleeping on the job. The January 2017 "Final Warning" said that Barnes had been "observed asleep at [his] desk several times; even in the same day." Norris Affidavit, Ex. A at 7. Barnes's August 2017 'Final Notice" said that several co-workers saw him sleeping at his

11

desk. *Id.*, Ex. B at 10. The first two warnings occurred before Barnes even requested FMLA leave. Then, months after Barnes returned from leave, two co-workers told Lantech they observed Barnes sleeping at his desk on separate occasions. *Id.*, Ex. D at 14, Ex. E at 16. Even Barnes's testimony that he was not sleeping, but was instead merely nodding off, does not call this explanation into question: nodding off and sleeping are of course entirely consistent. Barnes Deposition 76:15–77:6, 81:17–19.

Also important: the parties have already litigated whether Lantech terminated Barnes for sleeping. The Kentucky Division of Unemployment Insurance denied Barnes unemployment benefits after finding that Lantech terminated him for misconduct. Jefferson Cir. Ct. Op. and Order at 3. After a "referee" reversed the agency's determination, the Kentucky Unemployment Insurance Commission agreed that Barnes was in fact discharged for sleeping on the job and the Jefferson Circuit Court affirmed. *Id.* at 6. Barnes's summary-judgment opposition does not even respond to Lantech's point that collateral estoppel precludes his pretext argument. The Court may treat that failure to respond as a concession. *See AK v. Behavioral Health Sys.*, 382 F. Supp. 3d 772, 774–75 (M.D. Tenn. 2019). And given the significance of the parties' dispute on this very issue in this court, the state court, and the state agency, the Court finds that Barnes has conceded quite an important point: adjudication has already resolved that Lantech's nondiscriminatory reason was "based in fact." *See Lewis-Smith v. WKU*, 85 F. Supp. 3d 885, 915 (W.D. Ky. 2015).

Nor has Barnes pointed this tribunal to any evidence indicating Lantech "more likely than not" terminated Barnes because he took FMLA leave. *See Abdulnour*, 502 F.3d at 503 (citation omitted). He argues that the Court must reject Lantech's nondiscriminatory justification because the diabetes-related drowsiness that led to Barnes's FMLA leave is at least "intertwined with" the sleep that led to his termination. Response at 10. But termination *in retaliation for* FMLA leave is hardly

12

the same thing as termination *in some way related to* FMLA leave. Nor has the Sixth Circuit purported to replace the statutory requirement with any such substitute.

The Sixth Circuit decision on which Barnes relies—*Wallace v. FedEx Corp.*, 764 F.3d 571 (6th Cir. 2014)—does not add an intertwinedness prong to the *McDonnell-Douglas* analysis; it merely described the close relationship between termination and FMLA leave where the firing rested on an employee's asserted noncompliance with FMLA policy. Specifically, the court refused to overturn a jury verdict that FedEx interfered with an employee's FMLA rights when it fired her for not reporting back to work with an FMLA medical-certification form. *See id.* at 574. FedEx tried to argue that Wallace's firing was unrelated to the FMLA—that it turned on the FedEx attendance policy, not the FMLA leave or the Labor Department's requirement that employers tell employees about the consequences of not returning with a doctor's note. The Sixth Circuit disagreed: "Wallace's failure to report for work—and her subsequent termination—is a direct result of failing to perfect her FMLA leave, which is a consequence of FedEx failing to meet its responsibilities" under the statute and regulation. *Id.* at 590. The firing's "purported legitimate reason," the court held, "is intimately intertwined with the FMLA leave," such that the jury could find interference with the use of FMLA rights. *Id.*

*Wallace*, therefore, offers Barnes no help for several reasons. He has no evidence that Lantech retaliated against him for taking leave; any such connection would be extremely remote in time; Lantech has not even allegedly violated any FMLA regulations; and Lantech points to ample evidence that it would have terminated him regardless of his decision to take leave. That final point is crucial under *Wallace*. The Court recognized that "[a]n employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement," if (as here) "the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Id.* As discussed above, the dismissal warnings Barnes received months before his leave amount to

13

unrebutted evidence that Lantech would have dismissed Barnes "regardless of the employee's … taking of FMLA leave." *Id.*

All Barnes points to is a basic factual overlap: his leave and his firing both involved drowsiness: if Barnes hadn't gotten drowsy, he wouldn't have needed FMLA leave *and* he likely wouldn't have lost his job. That meager correlation offers no evidence of retaliation. Both effects depended on the same variable, but that doesn't mean one effect caused the other; unlike in *Wallace*, the employee's leave and the employer's reason stand independent of one another. As courts have recognized, taking FMLA leave does not automatically shield employees from termination for any related or "intertwined" reason: "the FMLA does not protect an employee from performance problems caused by the condition for which FMLA leave is taken." *McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1108 (10th Cir. 2002); *see also Dalpiaz v. Carbon Cty.*, 760 F.3d 1126, 1132 (10th Cir. 2014) ("if an employee's work-performance problems are related to the same illness that gave rise to FMLA leave, the employee may still be terminated based on his work-performance problems, regardless of the indirect causal link between the FMLA leave and the adverse decision.").[2]

Here, Lantech had pre-leave reasons to terminate Barnes that manifested themselves despite, not because of, Barnes's exercise of his FMLA rights. Barnes indisputably had performance issues before he took FMLA leave, then took FMLA leave at Lantech's suggestion, and heard repeated

---

[2] District courts denying summary judgment on the basis of *Wallace*'s "intimately intertwined" discussion have emphasized that the employer's reason for an adverse action related to interference with the exercise of FMLA rights, not to retaliation based on the underlying condition. *See, e.g., Archey v. AT&T Mobility Servs.*, No. 17-cv-91, 2019 WL 1434654, at *8 (E.D. Ky. Mar. 29, 2019) ("Here, similar to *Wallace*, [the employee's] unexcused absence … 'is a direct result of failing to perfect her FMLA leave.'" (quoting 764 F.3d at 590)); *Ezell v. Renal Care Group*, No. 5:17-cv-2, 2018 WL 2054562, at *9 (W.D. Ky. May 2, 2018) (denying summary judgment where the reason for termination was an "absence that may have … qualified as FMLA leave"); *West v. Pella Corp.*, No. 5:16-cv-154, 2018 WL 345115, at *8 (W.D. Ky. Jan. 9, 2018) (same); *Ashby v. Amscan, Inc.*, No. 3:15-cv-00643, 2017 WL 939324, at *8 (W.D. Ky. Mar. 9, 2017) (employee's "termination relate[d] directly to the FMLA leave and [the employer's] failure to give the required notice").

warnings of potential disciplinary consequences including termination.  No evidence in the record rebuts Lantech's contemporaneous explanations.

## Conclusion

The Court **GRANTS** Defendant Lantech.com, LLC's motion for summary judgment.

January 26, 2021

Benjamin Beaton, District Judge
United States District Court

cc: counsel of record